**UNITED STATES of America and the State of Michigan, Plaintiffs,**

v.

**Frederick and Sybil DAKOTA, and the Keweenaw Bay Indian Community, Defendants.**

No. M84–246CA2.

United States District Court, W.D. Michigan, N.D.

June 28, 1985.

John A. Smietanka, U.S. Atty. by Daniel M. Laville, Asst. U.S. Atty., Grand Rapids, Mich., for U.S.

Frank J. Kelley, Atty. Gen. by Charles D. Hackney, Asst. Atty. Gen., Lansing, Mich., for State of Mich.

Garfield Hood, L'Anse, Mich., for Keweenaw Bay Indian Community.

Hunter H. Watson, Laurium, Mich., for Frederick and Sybil Dakota.

Jeanette Wolfley, Boulder, Colo., for Bay Mills Indian Community.

William Rastetter, Cedar, Mich., for Grand Traverse Band of Ottawa & Chippewa Indians.

Barry L. Levine, Michigan Indian Legal Services, Inc., Traverse City, Mich., for Bay Mills Indian Community.

## OPINION AND JUDGMENT

MILES, Chief Judge.

This matter is before the Court on cross motions for summary judgment. On September 19, 1984 the United States and the State of Michigan brought a complaint for injunctive and declaratory relief against Frederick and Sybil Dakota and the Keweenaw Bay Indian Community requesting that the Dakotas be enjoined from operating a commercial gambling business, that the Keweenaw Bay Indian Community ("KBIC") be enjoined from issuing any "Commercial Gambling Licenses" to permit commercial gambling upon their federal reservation, and that the Court enter a declaratory judgment that commercial casino gambling on federal Indian reservations located within the State of Michigan is a violation of federal law.

The Bay Mills Indian Community and the Grand Traverse Band of Ottawa and Chippewa Indians were granted leave to appear as amici curiae. The State of Michigan was dismissed as a party plaintiff on November 27, 1984, but was granted leave to appear as amicus curiae.

The parties agreed that the facts in this case were not in dispute and that the matter could be resolved on cross motions for summary judgment. The parties filed three volumes of exhibits totalling 1378 pages and stipulated that they could be admitted into evidence and made a part of the record of this case.

A hearing was held in L'Anse, Michigan on March 1, 1985 for the purpose of hearing oral arguments on the cross motions for summary judgment. After a careful consideration of the briefs, oral arguments and exhibits, the Court renders the following opinion and order.

### Facts

Defendant Keweenaw Bay Indian Community is duly organized under the Indian Reorganization Act, 48 Stat. 984 and exercises control over the L'Anse Reservation as defined by treaty dated September 30, 1854, 10 Stat. 1109. The KBIC is controlled by a constitution and by-laws which were approved by the Office of Indian Affairs of the United States Department of the Interior on December 17, 1936. The reservation encompasses approximately 50,000 acres and about 1,200 members of KBIC live on the reservation.

The governing body of the KBIC is the Tribal Council which consists of twelve tribal members, six of whom are elected to staggered three year terms by tribal electors residing in the L'Anse district and six elected to staggered three year terms by tribal electors residing in the Baraga district.

Each year the tribal council selects from its membership five officers—a president, a vice president, a secretary, an assistant secretary and a treasurer—who are known

as the executive council. The council also selects such other officers and committees as may be necessary.

Frederick and Sybil Dakota are individual members of the KBIC. Fred Dakota has been a Tribal Council member of fourteen years and served as Tribal Chairman from 1971–82 except for one year, and as Executive Director for the most part from 1974–82.

On April 18, 1983 the Dakotas entered into a contract with the KBIC to lease land owned by the United States government in trust for the KBIC. The Dakotas' intent to open a commercial gambling establishment on the land was known to the Tribal Council. The lease itself, however, contained no statement of purpose. The lease was approved by the Area Director of the Bureau of Indian Affairs on behalf of the Secretary of the Interior on April 29, 1983.

On December 31, 1983 defendants Fred and Sybil Dakota, both of whom are members of the KBIC, opened a bar and casino in a two car garage attached to a home owned by a relative and located within the boundaries of the L'Anse Federal Reservation.

The Tribal Code of the KBIC, approved by the Secretary of the Interior on October 17, 1974, recognized the right of the Tribal Council to issue gambling licenses to operate "a public place or device where a risk is taken on a chance of winning money or other valuable property."

On May 13, 1981 the Tribal Council of KBIC adopted a resolution enacting certain amendments to the Tribal Criminal Code which amendments prohibited gambling except for any activity conducted on the reservation pursuant to and in accordance with a license issued by the Tribal Council. The amendment called for two types of licenses: those available to persons or entities proposing to operate gaming or gambling operations on behalf or for the benefit of non-profit or charitable groups; and a license for persons or entities proposing to operate or maintain gaming or gambling operations for profit and not on behalf of charitable and non-profit groups.

The ordinance was approved by the Bureau of Indian Affairs, United States Department of the Interior; such approval was qualified to the extent that no approval was given to the undertaking of any specific types of gambling activities.

On January 17, 1984, the Tribal Council issued defendant Fred and Sybil Dakota a gambling license for gambling operations for profit pursuant to Code § 1.2077 as added by the amendments of May 13, 1981.

Defendants Fred and Sybil Dakota operated their bar and casino at the two car garage location and conducted gambling activity on a for-profit basis continuously (except on Sundays and possibly other brief hiatuses) until July 3, 1984.

In the spring of 1984 the Tribal Council conducted a non-binding plebicite among the tribal electors on the issue of whether licensed casino gambling was an acceptable activity on the reservation. Those who voted expressed their approval by a three to one margin.

On June 8, 1984, the KBIC, acting through its Tribal Council, entered into an amended business lease agreement with defendants Frederick and Sybil Dakota, leasing to the Dakotas a parcel of land consisting of approximately 1.16 acres and located in the southeasterly quadrant of the intersection of U.S. Highway 41 and Lakeshore Road in Baraga Township, Baraga County, Michigan and within the boundaries of the L'Anse Federal Reservation. The lease was to run for a term of twenty-five years commencing upon approval by the Secretary of the Interior and the lessee was given the option for renewing for a further term of not more than twenty-five years. The land in question was unimproved. The lease stated that the premises would be used for "such gaming activities as may be licensed on the premises."

The Secretary of the Interior's approval was given to the lease on June 13, 1984.

The KBIC, acting by resolution of its Tribal Council, gave its consent to assignment of the lessee's interest in the business lease to Superior National Bank and Trust Company, Baraga Branch, as security for repayment of funds loaned to defendants

Fred and Sybil Dakota for the purpose of constructing a building and related improvements.

Defendants Fred and Sybil Dakota retained the Tribal Construction Company, an asset of the KBIC, to construct a building to house the lounge and casino operations which they had been operating in the garage facility. The building was completed in time for operations to be moved and commenced on July 4, 1984.

Since July 4, 1984, defendants Fred and Sybil Dakota have operated, under the business name "The Pines," a lounge and gambling casino on a continuous basis (except Sundays and other possible brief hiatuses) at that facility; they, on a regular basis, employ more than five persons for the purpose of conducting the gambling aspects of their operation and have experienced in excess of $2,000 gross receipts from gambling operations as a result of at least one day's activities.

The Pines employs thirty-three persons, the majority of whom are tribal members. The patrons have included tribal members, residents of the State of Michigan, and residents of Illinois, Indiana, Wisconsin, Oklahoma and Oregon.

The gambling activities conducted at The Pines include blackjack, craps, poker and pull tabs.

Over the spring and summer of 1984 the Tribal Council of the KBIC studied the need for more detailed regulation relative to licensed gambling activity, and adopted Regulations 1 through 9 on August 6, 1984 ("Regulations"). These Regulations were not submitted to the Bureau of Indian Affairs, Department of the Interior, for review or approval.

The Regulations provide at paragraph 1.015 that until the Gambling Commission has been constituted, the Tribal Council of the KBIC shall discharge the functions of the Gambling Commission. The Gambling Commission was constituted on November 30, 1984. The Tribal Council continues to act as the Gambling Commission until such time as the Gambling Commission has organized itself and adopted the necessary operating procedures.

The Tribal Council, acting as the Gambling Commission, without taking any formal action, has authorized defendants Fred and Sybil Dakota to continue gambling activities on a for-profit basis at The Pines pursuant to the license issued on January 17, 1984. The Tribal Council's action equated the previous license to a commercial gambling license pursuant to paragraph 3.010 of Regulation 3.

While operating as commercial gambling licensees, defendants Fred and Sybil Dakota have never filed any reports, submitted any financial data or accounted to the Tribal Council in any formalized manner.

Defendants Fred and Sybil Dakota hired a person who is not a member of the KBIC to act as a consultant, manager and trainer of gambling personnel. That person, one Edmund Janisse, had been convicted upon his plea of guilty to a misdemeanor involving dishonesty in the handling of the funds of his employer and of a felony for misappropriating the funds of his employer. His employer was a charitable organization conducting legalized gambling activities in Fargo, North Dakota. As a result of such conviction Mr. Janisse had served a portion of a ten month penitentiary sentence in the North Dakota State Corrections system. He was released on parole after good time was credited from his sentence and at the expiration of his sentence, he entered into a fifty month period of probation. One condition of his probation was that he restore the amount of $20,000 to his previous employer not later than the expiration of the probation period. Defendants Fred and Sybil Dakota were knowledgeable of Mr. Janisse's conviction and penitentiary confinement as well as his probationary status but did not make any disclosure of that information to the Tribal Council.

Mr. Janisse became an employee of Fred and Sybil Dakota during the late spring of 1984 and thus prior to August 6, 1984, the date on which the Regulations took effect. As such, Mr. Janisse was exempt from the background investigation required of key employees by paragraph 2.013 of the Regulations.

Edmund Janisse left the employ of Fred and Sybil Dakota in late October of 1984. Should he ever resume employment with defendant Fred and Sybil Dakota he would remain exempted from the mandatory termination requirements of the Regulations but would be subject to special restrictions imposed in the discretion of the Gambling Commission if operating at that time, or of the Tribal Council if operating in the place of the Gambling Commission.

From statehood in 1835 until July 1, 1972, Michigan's Constitution contained provisions prohibiting the legislature from enacting laws which would legalize lotteries of any type.

Since 1933 Michigan has, however, authorized pari-mutuel wagering on horse racing. *See* M.C.L.A. §§ 431.31 *et seq.* The Michigan Supreme Court held that such legislation did not violate the Constitutional prohibition against legalization of lotteries because the racing activity itself involved a significant element of skill in the preparation, handling and riding or driving of the animals, and because the act of wagering on the races involved a significant element of handicapping skill based upon objective data available to all bettors. *Rohan v. Detroit Racing Association*, 314 Mich. 326, 346, 22 N.W.2d 433 (1946).

The horse racing operations are conducted by private entrepreneurs for profit. The private profit nature of the horse racing enterprise is set forth by statute:

> The commissioner shall not issue a race meeting license to an organization organized for a charitable purpose or organized for the purpose of distributing its profits or income to charitable organizations.

Mich.Comp.Laws Ann. § 431.39(6).

In 1972 the Michigan electorate ratified an amendment to the Constitution to authorize lotteries and the sale of lottery tickets. Mich. Const. Art. 4, § 41.

The Michigan legislature enacted the McCauley-Traxler-Law-Bowman Lottery Act, 1972 P.A. 239, as amended, M.C.L. § 432.1 *et seq;* [Lottery Act"]. Section 9 of the Lottery Act mandated that the Lottery shall produce the maximum amount of net revenues for the State consonant with the general welfare of the people and directed the Commissioner to establish and operate a state lottery at the earliest feasible and practical time.

Also in response to the amendment of the State Constitution in 1972, the legislature enacted legislation allowing Bingo and ultimately other forms of gaming to be conducted by non-profit organizations meeting the criteria of the Act. 1972 P.A. 382, M.C.L.A. § 432.101 *et seq;* the "Traxler-McCauley-Law-Bowman Bingo Act" [hereinafter "Act"].

The Act originally covered only the subject of Bingo, but subsequent amendments have expanded the activities covered by the Act to include Millionaire parties, raffling and the sale of "pull tab" or "jar tickets" at licensed occasions.

The legislature has expressed its intent that the games be "conducted in a friendly, social and noncommercial manner." Mich. Comp.Laws Ann. § 432.113(3).

Eight bills have been introduced into the Michigan legislature from January 1, 1971 to date dealing with the subject of "casino gambling." None of the bills were ever reported from the committee to which they were assigned.

### Discussion

The United States has alleged that defendants' activities are in violation of the Assimilative Crimes Act, 18 U.S.C. § 13, made applicable to Indian reservations through the Indian Country Crimes Act, 18 U.S.C. § 1152, and the Organized Crime Control Act of 1970, 18 U.S.C. § 1955.

The Assimilative Crimes Act, 18 U.S.C. § 13 provides:

> Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in

force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

The Organized Crime Control Act, 18 U.S.C. § 1955 provides:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) 'illegal gambling business' means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

There is no dispute that the Dakotas' gambling operations at The Pines meets the second and third elements of "illegal gambling business" as defined in the act. More than five persons are involved in the operation of the business, and the business has been in continuous operation for over thirty days. In fact, there is general agreement that if the Dakotas' casino were not on an Indian reservation that it would be in violation of the law of the state and in violation of section 1955.

Defendants have not specifically objected to the application of section 1955 to Indian reservations. They have, however, argued that the laws of the State of Michigan are inapplicable to the conduct of tribal members on the L'Anse reservation under the doctrine of Indian sovereignty. Because the state has been dismissed as a party to this lawsuit, the Court is somewhat confused by defendants' argument.

The concept that Federally recognized Indian tribes and their members are immune from application of State law for on-reservation activities has long been recognized by the United States Supreme Court. As early as 1832, in a case holding that the State of Georgia could not enforce its laws on the Cherokee Reservation, which was within the external boundaries of the State, the Supreme Court held:

The Cherokee Nation, then, is a distinct community, operating its own territory, with boundaries accurately described, in which the laws of Georgia can have no force ... the whole intercourse between the United States and this Nation is, by our Constitution and laws, vested in the government of the United States.

*Worcester v. State of Georgia*, 31 U.S. (6 Pet) 515, 561 (1832).

The doctrine of Indian sovereignty continues to be a guiding principle in Indian cases. "[I]t must be remembered that tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." *Washington v. Confederated Tribes*, 447 U.S. 134, 154 (1980). The Indian sovereignty doctrine provides a crucial "backdrop" against which any assertion of State authority must be assessed. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611 (1983).

■ The doctrine of Indian sovereignty protects the Indian tribes from the assertion of state authority. In this case the state of Michigan has been dismissed as a party plaintiff. We no longer have the assertion of state authority. This case involves the assertion of federal authority under a federal law that incorporates state law.

■ There is no question that Indian tribes are subject to federal laws. *See e.g.*, *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) (Indian sovereignty exists only at the sufferance of Congress and is subject to complete defeasance). It is also well settled that Congress has the power to incorporate state laws in federal statutes, and has often done so.[1] Section 1955 has made

---

1. It is well-recognized that Congress can adopt as federal law the laws of a state. In *United*

*States v. Aquino*, 336 F.Supp. 737, 740 (E.D. Mich.1972), Judge Kennedy made the following

violation of state gambling laws a federal offense. This law applies throughout the United States, both on and off Indian reservations.

This Court is not the first to address this issue. In *United States v. Farris*, 624 F.2d 890 (9th Cir.1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 919, 920, 66 L.Ed.2d 839 (1981), Judge Choy held that section 1955 was applicable to Indians. Judge Kennedy, in a concurring opinion, agreed that there were persuasive policy reasons for applying section 1955 to the Indian defendants, but believed that such a determination was unnecessary for resolution of the case. Judge Browning, concurring in part and dissenting in part, stated that section 1955 does not apply to Indians because it was unreasonable to hold conduct which would not be punishable under the state law to be "violation of the law of a State" within the meaning of section 1955.

Although Judge Choy's opinion is only one of three opinions in a case which had no majority, his determination that section 1955 is applicable to Indian tribes has been followed in subsequent cases in the Ninth Circuit. In *Barona Group of the Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185, 1190 (9th Cir.1982), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983), a different panel of the Ninth Circuit was presented with the argu-

ment that bingo operations on an Indian reservation were violative of section 1955. The Court did not question the applicability of section 1955 to Indian reservations. Rather, it went to the second step of the analysis and determined that bingo games were not contrary to the public policy of California, and therefore did not violate section 1955.[2]

It is the defendants' contention that even if the Organized Crime Control Act of 1970, 18 U.S.C. § 1955, applies to conduct on Indian reservations, it does not apply to this action because there has be no "violation of the law of a State." Defendants cite *United States v. Farris*, 624 F.2d at 895–96, for the proposition that whether a tribal activity is a "violation of the law of the state" within the meaning of section 1955 depends on whether it is contrary to the "public policy" of the state.

Defendants argue that since the public policy of Michigan is to regulate rather than prohibit gambling, the Organized Crime Control Act of 1970 does not apply.

The government raises two objections to defendants' argument. First, the government disagrees that the regulatory/prohibitory distinction is applicable under section 1955. Second, the government disagrees that the public policy of the State of Michi-

---

statement regarding the incorporation of state laws in section 1955:

> It is a 'well-established principle that Congress may incorporate by reference state criminal laws in federal criminal statutes.' *United States v. Curcio*, 310 F.Supp. 351, 358 (D.Conn.1970). In *United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958), the Supreme Court upheld the Assimilative Crimes Act, Title 18, United States Code, Section 13, which prohibits conduct on federal enclaves which is prohibited by the criminal law of the state in which the enclave is located. The Court referred to this procedure of incorporating by reference State criminal statutes into Federal statutes as 'a practical accommodation of the mechanics of the legislative functions of State and Nation in the field of police power where it is especially appropriate to make the federal regulation of local conduct conform to that already established by the State.' *Id.* at 294, 78 S.Ct. at 296. Justices Douglas and Black, while dissenting from the majority, nevertheless observed, 'Of

course Congress can adopt as federal laws the laws of a State; and it often has done so. Even when it does so without an enumeration of the laws, it 'has acted as definitely as if it had repeated the words' used by the State, as Mr. Justice Holmes said in *Knickerbocker Ice. Co. v. Stewart*, 253 U.S. 149, 167, 40 S.Ct. 438, 64 L.Ed. 834 [1920].' 355 U.S. at 298, 78 S.Ct. 298. See also *Kentucky Whip & Collar Co. v. Illinois Central Railroad Co.*, 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270 (1937), and *Clark Distilling Co. v. Western Maryland Railroad Co.*, 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (1917), in which other federal statutes incorporating by reference state laws were upheld by the Supreme Court.

2. In a recent unpublished opinion from the Western District of Louisiana the court specifically declined to express an opinion as to whether the alleged gambling activities and bingo operations in that case would be subject to federal prosecution if conducted in Indian country. *Langley v. Ryder*, 602 F.Supp. 335 (W.D.La. 1985).

gan as it relates to commercial casino gambling is merely one of regulation rather than of prohibition.

## A. Regulatory/Prohibitory Distinction

Having determined that section 1955 is applicable to Indian reservations, the Court must now turn to the issue of whether defendants' activities constitute "a violation of the law of a State" under the Act.[3]

Defendants contend that for purposes of both section 1955 and the Assimilative Crimes Act the Court must differentiate between state laws that are criminal/prohibitory and those that are merely civil/regulatory. It is defendants' position that if the state gambling laws are merely regulatory, they cannot be applied on Indian reservations.

In *Farris*, 624 F.2d 890, the case relied on by the defendants for the application of the regulatory/prohibitory distinction, the Ninth Circuit upheld convictions under section 1955 for gambling businesses conducted on Indian trust land. The Court noted that Washington public policy prohibits the type of gambling business conducted by appellants and that therefore, for purposes of section 1955, their business was a "violation of the law of a State ... in which it is conducted." *Id.* at 895.

In *Barona Group of Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir.1982), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983), the Ninth Circuit interpreted *Farris* as holding that "whether a tribal activity is 'a violation of the law of a state' within the meaning of section 1955 depends on whether it is contrary to the 'public policy' of the state." *Id.* at 1190. Thus, the Court stated, "*Farris* makes co-extensive the tests for application of state law to Indian reser-

vations under § 1955 and for direct application of state law under Public Law 280." *Id.*

*Barona* appears to have overstated the language of *Farris*. It does, however, represent the law in the Ninth Circuit on this issue. *See e.g., United States v. Lummi*, No. C83–94C, unpublished oral opinion (W.D.Wash. Feb. 17, 1983) (commercial casino gambling is prohibited as a matter of public policy by Washington state law and therefore violates section 1955).

Nowhere in the text of 18 U.S.C. § 1955 or in its legislative history is any distinction made between regulatory and prohibitory state laws. The civil/regulatory—criminal/prohibitory distinction arose in cases dealing with Public Law 280, 18 U.S.C. § 1162; 28 U.S.C. § 1360. Public Law 280 provided that certain states would have general criminal and limited civil jurisdiction over causes of action arising in Indian country. The primary concern of Congress in enacting Public Law 280 was the problem of lawlessness on certain Indian reservations and the absence of adequate tribal institutions for law enforcement, *Bryan v. Itasca County*, 426 U.S. 373, 379, 383, 96 S.Ct. 2102, 2106, 2108, 48 L.Ed.2d 710 (1976), and the lack of adequate Indian forums for resolving private legal disputes between reservation Indians.

The Supreme Court, aware that an expansive reading of state jurisdiction under Public Law 280 could result in the undermining or destruction of tribal self-government, held that statutes passed for the benefit of dependent Indian tribes should be liberally construed, doubtful expressions being resolved in favor of the Indians. *Id.* at 392, 96 S.Ct. at 2112 (quoting *Alaska Pacific Fisheries v. United States*, 248

---

**3.** Section 1955 of the Organized Crime Control Act applies only to an illegal gambling business which "is in violation of the law of a state or political subdivision in which it is conducted."

It has been argued by amici Grand Traverse Band and Bay Mills that the language "or political subdivision" includes Indian reservations. Thus, amicus contends, since the gaming activities at issue are not in violation of the law of the Keweenaw Bay Indian community, they are not illegal within the meaning of the Act.

The Court does not find this argument persuasive. The plain meaning of the language "or political subdivision" refers to a smaller unit of State government, not to an Indian reservation within the state. Congress reasonably anticipated that some counties or cities would have stricter gambling laws than prevailed throughout the state, and chose to give effect to the stricter laws.

U.S. 78, 89, 39 S.Ct. 40, 41, 63 L.Ed. 138 (1918)). "[I]f Congress in enacting Pub.L. 280 had intended to confer upon the States general civil regulatory powers, including taxation, over reservation Indians, it would have expressly said so." 426 U.S. at 390, 96 S.Ct. at 2111.

From these statements developed the civil/regulatory—criminal/prohibitory distinction that is used in Public Law 280 states to prevent states from interfering too greatly with tribal sovereignty.

Section 1955 and the Assimilative Crimes Act, however, do not present the same problem. They do not grant states jurisdiction over tribal matters. Rather, they provide for federal jurisdiction. The question arises as to whether a principle developed to limit state jurisdiction over tribal affairs should be extended to limit federal jurisdiction over tribal affairs.

In *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), the Supreme Court rejected the proposition that the regulatory/prohibitory distinction should be read into 18 U.S.C. § 1161, a federal Indian statute which incorporates state law.

> The Court of Appeals appeared to accept the argument that Congress delegated to the tribes the exclusive right to license liquor distribution. According to this argument, the reference to state law in § 1161 refers only to the fact that for purposes of determining whether a violation of federal law has occurred, state substantive law, and not regulatory law, is to be incorporated by reference into the federal scheme. The difficulty with this argument is apparent. Nowhere in the text of § 1161, or in the legislative history, is there any distinction between 'substantive' and 'regulatory' laws. The distinction cannot be found in our decision in *Warren Trading Post Co. [v. Arizona Tax Comm'n]*, [380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965)] *supra*. See n. 13, *supra*. In the absence of a context that might possibly require it, we are reluctant to make such a distinction. Cf. *Bryan v. Itasca County*, 426 U.S. 373, 390, 96 S.Ct. 2102, 2111–2112, 48 L.Ed.2d 710 (1976) (grant of civil jurisdiction in 28 U.S.C. § 1360 does not include regulatory jurisdiction to tax in light of tradition from immunity from taxation).

103 S.Ct. at 3303 n. 18.

Nevertheless, there may be occasions which call for such a distinction to be read into federal laws as they are applied to Indian reservations.

In *United States v. Marcyes*, 557 F.2d 1361 (9th Cir.1977), the Ninth Circuit was presented with the argument that the Assimilative Crimes Act, 18 U.S.C. § 13, incorporates the general criminal code or prohibitory laws of a state, and cannot be used to enforce the penal provisions of state regulatory laws. The Court did not reach a decision on the issue, but noted that in *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 389 n. 8, 64 S.Ct. 622, 625 n. 8, 88 L.Ed. 814 (1944), the Supreme Court indicated that a strong argument exists that Congress did not intend to include the penal provisions of a state regulatory system within the ACA. "The rationale for this argument is obvious; a state could thereby enforce its regulatory system on the federal jurisdiction by making criminal any failure to comply with those regulations (i.e., licenses, permits, etc.)." 557 F.2d at 1364.

This Court will leave to another day resolution of the question of whether the regulatory/prohibitory distinction should apply to section 1955 or to the Assimilative Crimes Act, as such a determination is unnecessary to a resolution of the issues in this case.

B. *Michigan Law*

 Even if this Court were to find that the civil-regulatory/criminal-prohibitory distinction applies, the Court is satisfied that Michigan law, as applied to commercial casino gambling, is prohibitory in nature.

The Michigan Penal Code prohibits accepting money or valuable thing contingent on an uncertain event; keeping and occupying a building for gaming; keeping a gaming room for hire, gain or reward; selling pools and registering bets; publishing or distributing betting odds. Mich.Comp. Laws Ann. §§ 750.301–750.305. But it is

not only those who are involved in the operation of gambling activities who come within the reach of the Michigan Penal Code as it relates to gambling. Any person who wins money at gambling is guilty of a misdemeanor, Mich.Comp.Laws Ann. § 750.314, and any person who attends or frequents any place where gaming or gambling is permitted is guilty of a misdemeanor. Mich.Comp.Laws Ann. § 750.309.

The Michigan legislature has, on many occasions, considered bills which would legalize commercial gambling of the variety currently engaged in at The Pines. These bills, however have routinely been voted down or left to die in committee. The fact that such legislation has not been passed supports the proposition that commercial gambling is against the public policy of the State of Michigan.

The Michigan Court of Appeals recently addressed the public policy behind the gambling laws:

> The statutory scheme governing gambling is found at M.C.L. §§ 750.301–750.-315; M.S.A. §§ 28.533–28.547. The purpose of this scheme is to suppress gambling, an activity 'injurious to the morals and welfare of the people.' *Parks v. Judge of Recorder's Court*, 236 Mich. 460, 465–466, 210 N.W. 492 (1926).

*State of Michigan v. Nine Money Fall Games*, 130 Mich.App. 414, 343 N.W.2d 576, 578 (1983).

That commercial casino gambling is against the public policy of Michigan is further supported by the following language in *Oakland County Prosecuting Attorney v. 46th Judicial District Judge*, 76 Mich.App. 318, 256 N.W.2d 776, 779 (1977);

> Defendants say it is to be presumed that this statute was directed merely at organized, commercialized gambling. This conclusion is not supported when the entire gambling act is viewed as a whole. An examination of the Michigan statutes reveals that specific statutory provisions have been passed, directed at combating organized, commercialized gambling, M.C.L.A. § 750.302; M.S.A. § 28.534 and M.C.L.A. § 750.303; M.S.A. § 28.535. It

is not a reasonable interpretation to conclude that the above Section 301 was intended by the Legislature to be directed solely toward the same purpose. Furthermore, there have been various exceptions made by the Legislature where they have seen fit to exclude certain types of games and the allowance of lottery and bingo with further exceptions provided in M.C.L.A. § 750.310; M.S.A. § 28.542.... It would appear that, in enacting the gambling laws, the Legislature was attempting to alleviate the evils inherent in unregulated gambling such a cheating or fraud and the possibility that an individual might become so affected by such activity as to fail to care for the needs of himself or his family and become a charge on society. The Legislature has the right to conclude that gambling is injurious to the morals and welfare of the people and it is clearly within the scope of the state police power to suppress gambling in all of its forms.

Defendants argue that because of the broad exceptions to gambling contained in the millionaire party act, Mich.Comp.Laws Ann. § 432.101 *et seq.* and because of the state's encouragement of wagering on horse races and the state lottery, that the state in fact has no public policy against gambling, but merely regulates gambling activities within the state.

Initially, the Court is not persuaded that exceptions to the prohibitory scheme necessarily void a prohibitory intent. Like the Michigan law, 18 U.S.C. § 1955 exempts from its application any bingo game, lottery or similar game of chance conducted by a charitable organization if none of the receipts inure to the benefit of any private shareholder, member of employee. 18 U.S.C. § 1955(e). For those who do not come within this exemption, violation of section 1955 carries a maximum penalty of imprisonment for five years and a fine of $20,000.00. The exception has not made the statute non-penal in nature. Similarly, the Ninth Circuit stated in *Farris* that the Washington law against professional gambling was prohibitory despite a number of "limited exceptions." 624 F.2d at 897.

In *United States v. Lummi*, No. C83-94C, unpublished oral opinion (W.D.Wash.

Feb. 17, 1983), the Lummi Indian Tribe enacted an ordinance to authorize the playing of blackjack, poker and baccarat, and commenced gambling operations on the reservation. The Court held that Washington's gambling statutes were prohibitory and a matter of public policy, and that violations of those laws were therefore a violation of 18 U.S.C. § 1955.

The Washington gambling statute which was addressed in *Lummi* is far more explicit in its declaration of policy than is the corresponding Michigan statute.[4] Nevertheless, both statutory schemes prohibit commercial gambling, but at the same time allow for the raising of funds for charitable purposes through specific types of gambling conducted pursuant to statutory provisions.

Just as the Washington District Court found in *Lummi*, in regard to the Michigan laws, this Court also finds that "reduced to its essence, the legislature's 'declaration' is that professional gambling is prohibited and contrary to the public policy of the state and certain charitable fund raising activities are permitted if conducted pursuant to the statutory scheme." *Lummi*, transcript at 8.

Defendants argue that the games licensed and regulated by the bingo division of the Michigan State Lottery under the Millionaire/Las Vegas Party rules are indistinguishable from those casino games which are licensed and regulated in Nevada, Atlantic City, and on the L'Anse Federal Indian Reservation.

Apparently, defendants are of the opinion that because the same casino gambling games are authorized under the Millionaire Party Act, the state of Michigan has acknowledged that such games are not contrary to the public policy of the state.

While such an argument has superficial appeal, it ignores the great differences between the games as authorized under the Millionaire Party Act and the games as authorized in Las Vegas and at The Pines. The Millionaire Party Act authorizes the same games, but it limits the amount of winnings on a single game or in a single evening; it prohibits the operation of games by non-members of the charity, and it limits compensation for those running the games. With these limitations the games take on a very different characteristic from the games played in Las Vegas or at The Pines. The limitations are part and parcel of the activity. They cannot be separated. The State of Michigan is apparently not so concerned about the games played, as the opportunity they present for fraud and the infiltration of organized crime. These opportunities are minimized at Millionaire Parties where the stakes and winnings are limited, the games do not run for many days and the operators of the game are members of the charitable group. Gambling without these safeguards is against the public policy of the state. Michigan regulates non-commercial casino gambling. It prohibits commercial casino gambling.

The differences between the Dakotas' gambling operations and games authorized by the Millionaire Party Act are neither minimal nor inconsequential. The KBIC regulations and the Dakotas' operation at The Pines do not restrict the number of occasions during the annual licensing period upon which gambling activities may be conducted; do not restrict the scope or content of advertising of the licensed activity; do not limit an individual's winnings or the aggregate winnings to be paid out in a 24–hour period; do not impose restrictions on the work force to members of the tribe; and do not restrict the compensation which

---

4. The Washington statute, RCW 9.46.010 provides:

It is hereby declared to be the policy of the legislature recognizing the close relationship between professional gambling and organized crime to restrain all persons from seeking profits from professional gambling activities in this state, to restrain all persons from patronizing such professional gambling activities, to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling, and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities in social pastimes, which activities and social pastimes are more for amusement than for profit and do not maliciously affect the public and do not breach the peace.

may be paid to those who operate the gambling activities.

These activities are in direct contravention of Michigan prohibitory law.

The "high stakes bingo" cases relied on by defendants are distinguishable. Each of the cases arose in Public Law 280 states where the state or local authorities were seeking to directly enforce state laws or local ordinances on the reservations in question. *Barona Group of Capitan Grande Bank of Mission Indians v. Duffy,* 694 F.2d 1185, 1190 (9th Cir.1982), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983); *Seminole Tribe of Florida v. Butterworth,* 658 F.2d 310, 314 (5th Cir.1981); *Oneida Tribe of Indians v. State of Wisconsin,* 518 F.Supp. 712, 713 (W.D.Wisc.1981); *Washington v. Hatch,* No. C83–1518R, unpublished oral opinion, (W.D.Wash. Aug. 13, 1984). As noted earlier, a finding of state jurisdiction over reservations is, historically, strongly disfavored. The case presently before this Court, however, does not involve the assertion of state authority.

None of the "high stakes bingo" cases involved a strictly commercial business for private profit such as is involved in the present case. Each of the courts noted that the games were run by the tribes or by a management company which had contracted with the tribe, and the profits received were to be invested for the betterment of the Indian communities. *Barona,* 694 F.2d at 1190; *Butterworth,* 658 F.2d at 314 n. 7; *Oneida,* 518 F.Supp. at 713; *Hatch,* transcript at pp. 2–3.

Such considerations of generalized tribal benefit are not present in the instant case. The gambling activities directly benefit only defendants Fred and Sybil Dakota and are not even taxed by the tribe. No percentage of the profits are appropriated by the tribe and no accounting has been required.

In two of the cases the courts were influenced by the fact that the state gambling laws under review provided penalties for those who illegally conduct bingo games, but not for those who merely play in such games. Under Michigan law those who frequent an establishment where illegal gambling activities are taking place are subject to criminal sanctions as well as those who operate such establishments. Mich.Comp.Laws Ann. § 750.309. Thus the penal laws of Michigan are more comprehensive than those under review in the bingo cases.

### C. *Estoppel*

Defendants have argued that the government should be estopped from obtaining the relief requested because of its affirmative representations through the Department of the Interior that the Tribe could license commercial gambling establishments on the L'Anse Federal Indian Reservation. Specifically, the defendants note the Secretary's approval of the 1974 Tribal Code and the 1981 amendment which authorized the tribal council to issue gaming licenses for profit; the opinion letters from the office of the solicitor for the Bureau of Indian affairs regarding gambling; and the June 1984 approval of the amended business lease which provided that the building would be used for "such gaming activities as may be licensed upon the premises."

"Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984). Estoppel applies when "one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act ..." Restatement (Second) of Torts § 894(1) (1977).

■ As a general rule, the government may not be estopped on the same terms as any other litigant for the reason that when the government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interests of the citizenry as a whole in obedience to the rule of law is undermined. *Heckler,* 104 S.Ct. at 2224. Nevertheless, the Supreme Court has refused to expand this principle into a flat rule that estoppel may not in any circumstances run against the government. *Id.*

■ The burden on one claiming estoppel against the government is higher than

in other cases, but at the very least, the party must demonstrate that the traditional elements of an estoppel are present. *Id.*

The facts of this case do not support an estoppel against the government. To support a claim for an estoppel there must first be shown a misrepresentation by the adversary. Defendants have not demonstrated that the Secretary ever affirmatively represented that defendants could permissibly engage in commercial casino gambling on the reservation.

The Tribal Code of 1974 and the 1981 amendments approved by the Secretary of the Interior make no reference to commercial casino gambling. Section 1.2029 of the 1974 Code recognized the right of the Tribal Council to issue gambling licenses to operate "a public place or device where a risk is taken on a chance of winning money or other valuable property." The 1981 amendments, sections 1.2075 through 1.2077, provided that gambling could only be conducted pursuant to a license issued by the Tribal Council, and set forth the two varieties of licenses, for profit and non-profit.

Neither does the 1984 business lease approved by the Secretary refer to commercial casino gambling. The lease merely states that the premises will be used for "such gaming activities as may be licensed on the premises."

The February 4, 1982 opinion of the regional solicitor of the Bureau of Indian Affairs advised that the tribe could engage in gambling activities that are not violative of federal law. It noted that blackjack, poker and dice would not be unlawful under 15 U.S.C. §§ 1171–1178. It gave warning, however, of the *Farris* decision in the Ninth Circuit which held that such activities had been found to be in violation of 18 U.S.C. § 1955. The letter stated that under the federal Assimilative Crimes Act, 18 U.S.C. § 13, made applicable to Indian reservations through 18 U.S.C. 1152, the "prohibitory state criminal law" would be adopted as the criminal law of a federal enclave. As a final caveat the letter stated: "we have not taken the time to analyze all of the gambling laws of Michigan and ascertain their nature."

The November 4, 1983 letter from the Office of the Solicitor was even more cautionary. It warned that "Michigan caselaw has constructed the gambling statute very broadly, and it appears that any gambling activity which is not specifically permitted and regulated is prohibited."

The February 4, 1982 letter was received prior to the Dakotas' lease of the land where The Pines now sits. The November 4, 1983 letter was received prior to the December 31, 1983 opening of the Dakotas' first gambling operation in the garage and prior to the tribe's enactment of gambling regulations. These letters were sufficient to put the defendants on notice that the contemplated commercial casino gambling establishment might be in violation of federal law. Neither the approval given by the Secretary to the various codes nor the opinion letters can be considered to be affirmative approval by the Secretary of commercial casino gambling on the reservation.

Defendants were advised that they could engage in gambling activities that were not in violation of federal law; they were put on notice of the *Farris* decision which held commercial casino gambling to be illegal under 18 U.S.C. § 1955; they were advised that the Assimilative Crimes Act would apply prohibitory state criminal law; and they were advised that in Michigan, gambling activity which is not specifically permitted and regulated is prohibited.

Defendants went into the gambling business with their eyes open, knowing that this would be a test of federal law. The tribe has gone to considerable expense in drafting gambling regulations and the Dakotas have borrowed a considerable sum of money in this experiment with commercial casino gambling. Nevertheless, their decision to take a known risk that their conduct might be found to be illegal cannot now be blamed on misleading comments by the Secretary of the Interior. The Court finds no factual basis for defendants' estoppel defense.

*Conclusion*

Pursuant to the foregoing analysis, it is the Court's determination that Michigan law on commercial casino gambling is pro-

hibitory, that the Dakotas' gambling operation violates the Assimilative Crimes Act, 18 U.S.C. § 13, and the Organized Crime Control Act of 1970, 18 U.S.C. § 1955, and that the facts do not support an estoppel against the government from enforcing these laws.

Accordingly, the Court hereby enters a DECLARATORY JUDGMENT pursuant to 28 U.S.C. § 2201 that commercial casino gambling on federal Indian reservations located within the state boundaries of the State of Michigan is a violation of federal law. Further, Frederick and Sybil Dakota, their employees, agents, representatives or others acting in concert with any of the foregoing, are ENJOINED from continuing to operate a commercial gambling business and the Keweenaw Bay Indian Community is ENJOINED from issuing any "Commercial Gambling Licenses" to permit commercial gambling upon their federal reservation.

IT IS SO ORDERED.