624 F.2d 890
 UNITED STATES of America, Plaintiff-Appellee,
v.
Harold FARRIS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jody SATIACUM, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Allen Dudley POWELL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Louis J. BAKER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ray TURNIPSEED, Bertha Turnipseed, and MacKenzie Turnipseed,
Defendants- Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
David PAINTER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Melvyn LOCKWOOD, Defendant-Appellant.
 Nos. 78-3517, 78-3567, 79-1013, 79-1015, 79-1313, 79-1337
and 79-1338.
 United States Court of Appeals,
Ninth Circuit.
 June 11, 1980.
Rehearing Denied in Nos. 78-3517, 78-3567, 79-1013, 79-1015
and 79-1313 Aug. 14, 1980.
 
 William Wambold, Ramon Escure, Geoffrey Cross, Tacoma, Wash., J. Hartly Newsum, Bellevue, Wash., Donald H. McGavick, Annon W. May, Tacoma, Wash., argued for defendants-appellants; Arthur Knodel, John O'Connell on brief.
 Christine McKenna, Asst. U. S. Atty., Seattle, Wash., for the U. S.
 Appeal from the United States District Court for the Western District of Washington.
 Before BROWNING, CHOY and KENNEDY, Circuit Judges.
 CHOY, Circuit Judge:
 
 
 1
 Appellants attack their convictions under 18 U.S.C. § 1955 on the ground that their large-scale gambling businesses on Indian trust land did not violate state law, and on other grounds. We affirm.
 
 I. Background: The Law
 
 2
 Enacted as part of the Organized Crime Control Act of 1970, 18 U.S.C. § 1955 reads in pertinent part:
 
 
 3
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 
 
 4
 (b) As used in this section
 
 
 5
 (1) "illegal gambling business" means a gambling business which
 
 
 6
 (i) is a violation of the law of a State or political subdivision in which it is conducted ;
 
 
 7
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 
 
 8
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 
 
 9
 (Emphasis added.)
 
 
 10
 We held in United States v. Sacco, 491 F.2d 995 (9th Cir. 1974) (en banc), that § 1955 "was aimed at curtailing syndicated gambling, the lifeline of organized crime, which provides billions of dollars each year to oil its diversified machinery." Id. at 998. "Congress determined that organized crime posed a major threat to American society and that illegal gambling operations provided organized crime with its greatest source of revenue." Id. at 999.
 
 
 11
 Judge Browning correctly says that § 1955 was designed to aid the enforcement of state law, especially where state enforcement is disabled by the corruption of state officials, but the statute also serves to further independent federal interests. Congress found that "illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof," id. at 999; moreover, "(t)he illicit operations were seen to distort the production of goods for commerce and the flow of goods in interstate commerce," id. at 1000.
 
 
 12
 Section 1955 is constitutional, even as applied to cases with no connection with interstate commerce or organized crime. Id. at 999-1000. It is not unconstitutionally vague. Id. at 1001-02.
 
 
 13
 Since Congress has the power to "incorporate by reference" state law, § 1955 does not violate the equal protection component of the due process clause even though it "applies only in states where gambling is illegal." Id. at 1003.
 
 II. Background: The Facts
 
 14
 On the generally undisputed facts, appellants stand guilty under this section unless the words "violation of the law of a State" exempt them. In 1977 and 1978, appellants operated significantly profitable casinos on Puyallup Indian reservation land within one mile of Tacoma and 25 miles of Seattle. The casinos, without any approval or license from the Washington State Gambling Commission, featured blackjack, poker and dice; their large net win was obtained at the expense of a clientele that included many non-Indians and some out-of-staters. Farris, Satiacum, Bertha Turnipseed and MacKenzie Turnipseed are Puyallup Indians; Baker, Powell, Lockwood, Painter and Ray Turnipseed are not.[1]
 
 III. Issues
 A. Applicability of § 1955 to Indians
 
 15
 The Puyallup appellants first claim that § 1955 does not apply to them at all. However, federal laws generally applicable throughout the United States apply with equal force to Indians on reservations. For example, even as to Indians on reservations, federal jurisdiction extends "to crimes over which there is federal jurisdiction regardless of whether an Indian is involved, such as assaulting a federal officer." United States v. Wheeler, 435 U.S. 313, 330 n. 30, 98 S.Ct. 1079, 1090, 55 L.Ed.2d 303 (1978); accord, Walks on Top v. United States, 372 F.2d 422 (9th Cir.) (assaulting a federal officer), cert. denied, 389 U.S. 879, 88 S.Ct. 109, 19 L.Ed.2d 170 (1967); see United States v. Burns, 529 F.2d 114 (9th Cir. 1976) (possession of firearm by a felon); Head v. Hunter, 141 F.2d 449 (10th Cir. 1944) (forgery to defraud the United States).
 
 
 16
 There seem to be three exceptions to this rule, but appellants fall within none. First, reservation Indians may well have exclusive rights of self-governance in purely intramural matters, unless Congress has removed those rights through legislation explicitly directed at Indians. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55-56, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106, 113 (1978), citing Roff v. Burney, 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897) (tribal membership); Jones v. Meehan, 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899) (inheritance rules); and United States v. Quiver, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916) (domestic relations). Or, to put it another way, "Indian tribes retain exclusive jurisdiction over essential matters of reservation government, in the absence of specific Congressional limitation." Arizona ex rel. Merrill v. Turtle, 413 F.2d 683, 684 (9th Cir. 1969), cert. denied, 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970). But even a general federal law suffices to proscribe the large-scale professional gambling involved here; such gambling is neither profoundly intramural (the casinos' clientele was largely non-Indian) nor essential to self-government.
 
 
 17
 Second, it is presumed that Congress does not intend to abrogate rights guaranteed by Indian treaties when it passes general laws, unless it makes specific reference to Indians. Antoine v. Washington, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); United States v. White, 508 F.2d 453 (8th Cir. 1974). But this rule applies only to subjects specifically covered in treaties, such as hunting rights; usually, general federal laws apply to Indians. E. g., Superintendent v. Commissioner, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 (1935) (income tax). A different norm would only necessitate a huge quantity of statutory boilerplate.
 
 
 18
 To bring the special rule into play here, general treaty language such as that devoting land to a tribe's "exclusive use" is not sufficient (although such language does suffice to oust state jurisdiction); there would have to be specific language permitting gambling or "purporting to exempt Indians from the laws of general applicability throughout the United States regardless of situs of the act." United States v. Burns, 529 F.2d 114, 117 (9th Cir. 1976). Of course, there is no such specific language in the United States' treaty with the Puyallups, the Treaty of Medicine Creek, 10 Stat. 1132 (1854).
 
 
 19
 Finally, if appellants could prove by legislative history or some other means that Congress intended § 1955 not to apply to Indians on their reservations, we would give effect to that intent. But no evidence of such Congressional intent exists; indeed, "it defies reason to suppose that Congress intended" such an exemption, see United States v. Montana, 604 F.2d 1162, 1168 (9th Cir. 1979). Puyallup casinos in the Tacoma-Seattle area would flourish as mightily as those in such areas as Las Vegas and Atlantic City. Casinos on Indian land would defeat or endanger the federal interests of protecting interstate commerce and preventing the takeover of legitimate organizations by organized crime. We think the following passage from United States v. Montana bears repeating:
 
 
 20
 We must recognize that in this case, as in others in which we are required to fix the rights and powers of Indians in the latter part of the twentieth century in the light of treaties of an earlier century, our task is to keep faith with the Indian while effectively acknowledging that Indians and non-Indians alike are members of one Nation. Both seek power and gain through identical processes, viz. commerce, politics, and litigation. We must, however, live together, a process not enhanced by unbending insistence on supposed legal rights which if found to exist may well yield tainted gains helpful to neither Indians nor non-Indians.
 
 
 21
 Id. at 1169. We find that Congress did not intend that Indians could freely engage in the large-scale gambling businesses that it forbade to all other citizens.
 
 
 22
 Therefore, we hold that § 1955 applies to appellants.
 
 
 23
 B. "Violation of the Law of a State"
 
 1. Puyallup Appellants
 
 24
 The Puyallup appellants argue that even if § 1955 applies to them, they are not guilty of violating it. The casinos they operated on reservation land were not "(in) violation of the law of a State," they say, because the Washington state gambling laws do not extend past the reservation boundaries. We hold that appellants' premise is correct, but that their conclusion does not follow.
 
 
 25
 a. State Jurisdiction Over Gambling
 
 
 26
 The originally independent Indian nations, after conquest or acceptance of United States protection, came under federal control and the plenary power of Congress to remove every aspect of sovereignty from them. "But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).
 
 
 27
 The treaty with the Puyallups is the Treaty of Medicine Creek, 10 Stat. 1132 (1854). Article II of the Treaty says that reservation land shall be "marked out for their exclusive use." Comparable language in other Indian treaties has been held to preserve Indian self-government as against state regulation. E. g., Williams v. Lee, 358 U.S. 217, 221-22, 79 S.Ct. 269, 271, 3 L.Ed.2d 251, 254-55 (1959).
 
 
 28
 Therefore, the traditional rule is that states have no criminal jurisdiction over offenses committed by Indians on Indian trust land. The rationale for this rule, however, has been changing: "(T)he trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption." McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973); compare Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). The Ninth Circuit takes the modern position. Santa Rosa Band of Indians v. Kings County, 532 F.2d 655, 658-59 (9th Cir. 1975), cert. denied, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977).
 
 
 29
 However, in 1953 Congress delegated to the states some of its power to regulate affairs on Indian reservations, by passing the Act of Aug. 15, 1953, Pub.L.No. 83-280, 67 Stat. 588 ("Public Law 280"). Section 2 of "Public Law 280," codified at 18 U.S.C. § 1162(a), immediately placed enumerated Indian lands under the full criminal jurisdiction of the states they were located in. (This section did not include the Puyallup land.) Section 7 of "Public Law 280" gave the necessary federal consent for states to take full criminal jurisdiction over all other Indian lands, if the state passed legislation to that effect. Under this section, Washington in 1963 enacted Wash.Rev.Code § 37.12.010 and took jurisdiction over its Indians and Indian lands (including the Puyallups and their land). However, as to acts both committed by Indians and committed on Indian land, Washington took jurisdiction only over eight specific subject areas chiefly welfare, family law and motor vehicles but not gambling. Apart from this statute, the Washington courts do not have jurisdiction over crimes committed by Indians on Indian land, unless the tribe in question has requested the state to assume jurisdiction. See Arquette v. Schneckloth, 56 Wash.2d 178, 351 P.2d 921 (1960). This partial assertion of jurisdiction was recently upheld in Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979).[2]
 
 
 30
 On the other hand, § 37.12.010 asserted full criminal jurisdiction in all subject areas over offenses committed on Indian land by non-Indians. This state jurisdiction is "complete." 439 U.S. at 498, 99 S.Ct. at 760, 58 L.Ed.2d 766. Indeed, it is fitting for a state to take such jurisdiction over non-Indians, for under no circumstances could such offenders be tried in tribal courts anyway. Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).
 
 
 31
 In sum, Washington may not enforce its gambling laws against the Puyallups on their reservation; however, it may enforce those laws against non-Indians, even on the Puyallup reservation.
 
 
 32
 b. No Immunity From § 1955
 
 
 33
 Given that Washington cannot enforce its gambling laws against the Puyallup appellants for their actions on Puyallup trust lands, nonetheless their actions were a "violation of the law of a State" for purposes of § 1955. The reason for that limitation was not to exempt from federal criminal liability those gambling-business operators who might be beyond the reach of a state's criminal jurisdiction, but rather to exempt from the federal statute the operators of gambling businesses that are not contrary to a state's public policy on gambling. Congress' intent was merely that § 1955 not apply indiscriminately to Nevada casino operators, Florida fronton operators, etc. Section 1955 as written "applies only in states where gambling is illegal." United States v. Sacco, 491 F.2d at 1003.
 
 
 34
 Washington public policy prohibits the type of gambling business conducted by appellants. See Wash.Rev.Code §§ 9.46.010, 9.46.220. Therefore, for the purposes of the federal statute, their business was a "violation of the law of a State . . . in which it is conducted." The policy underlying § 1955 is that large-scale gambling is dangerous to federal interests wherever it occurs. The limitation of § 1955 to gambling that is a "violation of the law of a State or political subdivision in which it is conducted" does not reflect a Congressional judgment that gambling countenanced by state and local authorities does not harm federal interests; rather, it reflects Congress' judgment that the harm is outweighed by the interest of federalism that national legislation not trample the desires of particular states, which on the subject of gambling are expressed by the lack of prohibitory laws.
 
 
 35
 If the appellants' argument prevailed, the federal interests served by § 1955 would be thwarted, without any benefit to the countervailing federalism interest. It might not be long before organized crime invaded the Puyallup reservation. As the appellants ironically take pains to point out, one purpose of § 1955 was to prevent organized-crime infiltration of legitimate organizations. S.Rep.No. 617, 91st Cong., 1st Sess. 80 (1969). The federal law could thus be most appropriately applied here, for the casino operations placed the tribe in danger of mob takeover, whether it realized it or not. Moreover, the other major evil of large-scale gambling harm to the national economy arises regardless of whether a casino is on Indian or non-Indian land, especially when the clientele is not limited to Indians.
 
 
 36
 In this Circuit, "the immunity of Indian use of trust property from state regulation (is) based on the notion that trust lands are a Federal instrumentality held to effect the Federal policy of Indian advancement." Santa Rosa Band of Indians v. Kings County, 532 F.2d 655, 666 (9th Cir. 1975), cert. denied, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977). Under this view, it would be most inappropriate for immunity from state regulation to defeat the federal policies of opposition to large-scale gambling, protection of legitimate organizations from organized-crime infiltration, and promotion of the welfare of Indians. Therefore, we hold that § 1955 extends even to Indians on Indian lands who are immune from state law, and the convictions of Farris, Satiacum, Bertha Turnipseed and MacKenzie Turnipseed are affirmed.
 
 2. Non-Puyallup Appellants
 
 37
 Since § 1955 extends to Indian country, and the Washington gambling laws extend to non-Puyallups on Puyallup land, there is no doubt that the § 1955 convictions of non-Puyallups Baker, Powell, Lockwood, Painter, and Ray Turnipseed must be affirmed.[3]
 
 C. Other Arguments
 
 38
 The several other arguments that appellants raise lack merit.
 
 1. Preemption
 
 39
 Appellants assert that 15 U.S.C. § 1175, which specifically makes it "unlawful to . . . possess . . . any gambling device . . . within Indian country," should be construed to preempt the field of federal regulation of gambling on reservations and make § 1955 inapplicable there. But the phrase "gambling device" in § 1175 is limited in 15 U.S.C. § 1171(a) to slot machines and other gambling machines and mechanical devices, which the casinos here were conspicuously cautious to avoid. Section 1955 covers all kinds of gambling, including the kinds involved in this case. Moreover, the comprehensive § 1955 was passed 19 years after § 1175. Therefore, we hold that § 1175 does not preempt all other federal regulation of gambling on reservations, and the United States was free to proceed, in the exercise of prosecutorial discretion, under § 1955. See Hutcherson v. United States, 345 F.2d 964, 967 (D.C.Cir.), cert. denied, 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965).
 
 
 40
 Nor are we convinced that § 1955's harsher penalty proves that Congress meant only § 1175 to apply to Indians. The federal interests challenged by a violation of § 1955 (large-scale gambling subject to mob involvement) are more weighty than those affected by a violation of § 1175 (possession of a gambling machine on an Indian reservation). Moreover, the harm to the federal interests protected by § 1955 of a casino on Puyallup land would be as great as that flowing from a similar casino in San Francisco or Chicago.
 
 2. Exemption from State Law
 
 41
 The Puyallup appellants argue that if the state gambling laws may be enforced against them through § 1955, their treaty-based right to be free from the state criminal jurisdiction will be vitiated. But the Puyallups are subject to the plenary criminal jurisdiction of Congress, which can freely adopt state gambling laws expressly or by reference. Especially is this true where Congress acts not merely in aid of state law, but to secure independent federal interests, as it did by enacting § 1955. Moreover, Washington state's gambling laws would be enforceable by the United States against Puyallups on their reservation even in the absence of § 1955. The enclave laws of the United States are extended to Indian country by 18 U.S.C. § 1152 (but not as to "offenses committed by one Indian against the person or property of another Indian," id.). One such enclave law is the Assimilative Crimes Act, 18 U.S.C. § 13.[4] Therefore, we have held that Washington's prohibitory (but not regulatory) laws can be enforced by the federal government on the Puyallup reservation. United States v. Marcyes, 557 F.2d 1361, 1364 (9th Cir. 1977); see United States v. Sosseur, 181 F.2d 873 (7th Cir. 1950). Like the Washington law against the possession of dangerous fireworks, considered in Marcyes, the Washington law against professional gambling is prohibitory despite a number of "limited exceptions." See 557 F.2d at 1364; Wash.Rev.Code § 9.46.220. Also, operating a casino with a non-Indian clientele is not an offense "committed by one Indian against the person or property of another Indian."
 
 3. Vagueness
 
 42
 Appellants claim that § 1955 is unconstitutionally vague as applied to Indians, relying on the well-recognized rule of construction that statutory ambiguities are to be resolved in favor of Indians. Their argument is that the state gambling regulations are so voluminous and detailed that an intelligent Indian could not understand them. We reject this novel argument that detail creates vagueness. Moreover, these appellants were not tripped up by a detail, but flagrantly violated the core of the state law, albeit they were beyond the state's jurisdiction.
 
 4. Fundamental Fairness
 
 43
 Appellants also raise a due process (fundamental fairness) point against applying § 1955 to an Indian who in good faith believed that state gambling laws did not reach him on the reservation. But this prosecution is under the federal § 1955, which the Puyallup appellants apparently gave no thought to, and did violate. Any unfairness that they might feel subjected to here does not rise to the level of a due process/fundamental fairness violation, especially considering that their conduct was not exactly simon-pure.
 
 5. Tribal Regulation
 
 44
 Although the Puyallup Tribe temporarily enacted a Gambling Code after the events involved in this case, no such tribal regulation was in effect at the time appellants' casinos were operating. Therefore we need not consider what effect such tribal regulation would have.
 
 6. Freedom From Organized-Crime Influence
 
 45
 Some appellants argue that their casino was never polluted by organized crime. This does not, however, prevent conviction under § 1955. United States v. Sacco, 491 F.2d at 1000.
 
 7. Instructions as to Baker
 
 46
 Baker contends that it was error to refuse his proffered instructions that state gambling laws do not apply to Indians on Indian land and that the Government must prove beyond a reasonable doubt that he knew his gambling operation violated state law.
 
 
 47
 Since Baker is not an Indian, the refusal of the first request was harmless, at worst. On the specific intent point, the court instructed that § 1952 requires "specific intent to facilitate an activity which the accused knew to be unlawful under state law." This captured the gist of Baker's request and may in any event have been a more favorable instruction than the law entitled him to.
 
 IV. Conclusion
 
 48
 The convictions of all the appellants are AFFIRMED.
 
 
 49
 BROWNING, Circuit Judge, concurring in part, dissenting in part:
 
 
 50
 I concur in Judge Choy's opinion insofar as it affirms the conviction of defendants who are not Puyallup Indians.
 
 
 51
 The indictments charged that the various defendants had engaged in "an illegal gambling business . . . involving the playing of blackjack, poker and dice in violation of the law of the State where the gambling business was conducted (R.C.W. 9.46)." The chapter of the Revised Code of Washington cited in the indictments provides for the licensing and regulation of gambling activities, and imposes criminal penalties for violation of the statute (R.C.W. 9.46.180), or of regulations adopted pursuant to the statute (R.C.W. 9.46.185).
 
 
 52
 It is conceded that the State could not prosecute the Puyallup appellants under the provisions of the Washington Code cited in the indictment. As Judge Choy points out, the State of Washington has elected not to exercise jurisdiction over gambling offenses committed by Indians on Indian lands unless the tribes request the State to do so, and the Puyallups have not. The decision not to assert jurisdiction expresses the State's general policy to exercise criminal jurisdiction over Indian reservations in a way that leaves "play for tribal self-government." Washington v. Yakima Indian Nation, 439 U.S. 463, 499, 99 S.Ct. 740, 760, 58 L.Ed.2d 740, 766 (1979).
 
 
 53
 Nevertheless, Judge Choy adopts the position that the actions of the Puyallups "were a 'violation of the law of a state' for purposes of § 1955." This interpretation of the statute seems to me to be untenable. It exceeds the limits of reasonable construction to hold that conduct which could not be punished under the state law is nonetheless "a violation of the law of (the) State" within the meaning of 18 U.S.C. § 1955. Conduct to which the law is inapplicable does not violate the law in the ordinary meaning of those words. The idea that a person can transgress state law by conduct not punishable under that state law is inconsistent with minimum notions of notice and fairness.
 
 
 54
 Nothing in the legislative history of section 1955 supports the thesis that Congress intended to punish conduct that violated a state's policy on gambling even though it did not violate state law. The expressed purpose of Congress was to confer federal jurisdiction over the major forms of "illegal gambling" (see, e. g., H.R. Rep. No. 1549, 91st Cong., 2d Sess. 53 (1970), U.S.Code Cong. & Admin.News 1970, p. 4007; S. Rep. No. 617, 91st Cong., 1st Sess. 73 (1969)), and there is no reason to suppose that the term "illegal gambling" was used in any but its common sense of "in violation of the law."
 
 
 55
 The federal statute was intended to aid local law enforcement efforts. Congress did not intend to assert federal jurisdiction where state law allowed no local law enforcement effort at all. In the words of the Senate floor manager, the purpose of the federal statute was to "add to . . . local efforts, the expertise, the manpower and the full resources of the Federal Bureau of Investigation, and other appropriate agencies of the Federal Government" (emphasis added). 116 Cong.Rec. 591 (1970) (remarks of Senator McClellan). Section 1955 was designed to improve "the established State-Federal law enforcement partnership"; solitary federal action was seen to be necessary "where local and State governments have been rendered powerless because of the corruption of the responsible officials." 116 Cong.Rec. 604 (1970) (remarks of Senator Allott). "This limited federal intervention should serve to reinforce the powers of the States and local governments in our federal system, rather than inject the Federal Government into a responsibility traditionally left to the state." S. Rep. No. 617, 91st Cong., 1st Sess. 74 (1969).
 
 
 56
 Judge Choy's opinion justifies an expansive reading of section 1955 based on a supposed "policy underlying § 1955 . . . that large-scale gambling is dangerous to federal interests wherever it occurs." The legislative history suggests no such policy. Congress was not concerned with gambling per se. The statute was addressed to what Congress perceived as a vicious circle of illegal gambling resulting in large profits which the criminal element then used to corrupt local officials to purchase protection for illegal gambling and other unlawful activities, thus further expanding their illegal operations and increasing their profits. In the preamble to the portion of the Organized Crime Control Bill that later became 18 U.S.C. § 1955, the Senate made the special finding that illegal gambling operations thwarted the enforcement of criminal laws by "the corruption and bribery of State and local officials." S. Rep. No. 617, 91st Cong., 1st Sess. 16 (1969). The same belief was expressed in the House. 116 Cong.Rec. 35295 (1970) (remarks of Congressman Poff). Federal intervention was thought necessary to make state and local laws effective "where local and state governments have become, in effect, incapable of law enforcement by reason of the corruption of responsible officials." S. Rep. No. 617 at 74. The prohibition of illegal gambling businesses was coupled with a prohibition of conspiracies to obstruct state law in furtherance of illegal gambling. See Organized Crime Control Act of 1970, Title VIII, Part B, 84 Stat. 922 (1970), codified as 18 U.S.C. § 1511.
 
 
 57
 Conduct that violates state law only in the sense that it is contrary to state policy, and that is subject neither to criminal penalties nor to civil sanctions imposed at the instance of law enforcement officials, would not pose the problems with which Congress was concerned. In the case at hand, for example, there was no need for the Puyallups to bribe state officials when there was no law under which the state could prosecute them.
 
 
 58
 Under the theory expressed in Judge Kennedy's concurrence, all those involved in a gambling business would be subject to federal prosecution if the involvement of any of them violated state law. The legislative history does not support so expansive a reading: there is nothing to suggest that Congress intended persons innocent under state law to answer under Section 1955 for the crimes of their associates.
 
 
 59
 Because no state or local law prohibited the actions of the Puyallup defendants, 18 U.S.C. § 1955 does not apply. The convictions of these defendants should be reversed.
 
 KENNEDY, Circuit Judge, concurring:
 
 60
 I concur in the affirmance of the convictions of all the appellants. Although there are persuasive policy reasons, elaborated in Judge Choy's opinion, for applying section 1955 to the Puyallup appellants, I am more persuaded by a simple and literal reading of the statute. The statute makes it a violation of federal law to operate "an illegal gambling business." The federal statute focuses on whether the business itself is "a violation of the law of a State," and the gambling operation in this case necessarily involved violation of state law, inasmuch as the non-Indian partners were subject to state prosecution by their operation of the business. This is sufficient to constitute the business itself, in its entirety, an "illegal gambling business" for the purposes of section 1955. That only some of the acts of the operators of the business were subject to state prosecution is to me immaterial to the question whether or not the business is an illegal gambling business for the purposes of federal law. The gambling casino in question was a single entity, an entity that was operated in violation of Washington law, and there was no separate, legally isolated portion of the gambling casino in which the Indians alone were involved.
 
 
 61
 If section 1955 were to read: "Whoever conducts, finances, manages, . . . in violation of state law, a gambling business shall be fined not more than $20,000 or imprisoned not more than five years," then we would be presented with the issue upon which Judge Browning bases his dissent. The italicized language is, however, not in the statute. In my view, the reading of the statute I propose is not only literally persuasive, but also rests on the common-sense proposition that a gambling enterprise that entails clear and unambiguous violations of state law by the non-Indian operators is certainly no less within either the policy or the plain language of section 1955 merely because it also entails acts by Indian operators that may or may not be violations of state law. It is a defendant's involvement in a business that a state prohibits, rather than his commission of particular individual acts that a state may prosecute, that constitutes the defendant's violation of section 1955. I would leave for another day the question addressed by Judges Browning and Choy whether or not the federal statute would also prohibit a gambling business operated exclusively by Indians on a reservation.
 
 
 
 [1]
 Powell is one-fourth Cherokee. Because only Puyallups are exempt from state regulation on the Puyallup reservation, however, we consider him a non-Indian for the purposes of this case
 
 
 [2]
 In 1968 Congress passed the Indian Civil Rights Act, retracting from the states some of this power to assert jurisdiction. Previous assertions were honored, but for a future assertion to be effective not only must the state enact legislation, but tribal consent must also be obtained. 25 U.S.C. § 1321(a). The Puyallups have never given their consent to any state jurisdiction. Thus Wash.Rev.Code § 37.12.010 would be invalid if it were passed for the first time today, but it is valid law because it was passed in 1963, during the reign of Section 7 of "Public Law 280."
 
 
 [3]
 Baker was also found guilty of violating 18 U.S.C. § 1952 for his interstate travel in aid of his gambling business. We affirm this conviction for the same reasons we affirm his § 1955 conviction
 
 
 [4]
 Whoever within (a federal enclave) is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment
 18 U.S.C. § 13.