# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
     *Plaintiff-Appellant,*

v.

HARRY JAMES SMISKIN,
     *Defendant-Appellee,*

YAKAMA NATION COMMERCE
ASSOCIATION; YAKAMA NATION,
     *Applicants-Intervenors.*

No. 05-30590

D.C. No.
CR-04-02107-EFS

UNITED STATES OF AMERICA,
     *Plaintiff-Appellant,*

v.

KATO SMISKIN,
     *Defendant-Appellee.*

No. 05-30591

D.C. No.
CR-04-02108-EFS

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Edward F. Shea, District Judge, Presiding

Argued and Submitted
October 17, 2006—Seattle, Washington

Filed May 18, 2007

Before: Dorothy W. Nelson, David R. Thompson, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

5837

## COUNSEL

James A. McDevitt, United States Attorney, and Jane Kirk, Assistant United States Attorney, Yakima, Washington, for the plaintiff-appellant.

Rebecca L. Pennell, Federal Defenders of Eastern Washington and Idaho, Yakima, Washington, for defendant-appellee Kato Smiskin.

Russell Mazzola, Mazzola Law Office, Yakima, Washington, for defendant-appellee Harry James Smiskin.

Sharon I. Haensly, Debora Juarez, Gabriel S. Galanda, and Daniel W. Ferm, Williams, Kastner & Gibbs PLLC, Seattle, Washington, for amicus The Yakama Nation.

Jack W. Fiander, Towtnuk Law Offices, Ltd., Sacred Ground Legal Services, Inc., Yakima, Washington, for amicus Yakama Nation Commerce Association.

---

## OPINION

PAEZ, Circuit Judge:

The Right to Travel provision of the Yakama Treaty of 1855 secures to Yakama tribal members the right to travel upon the public highways.[1] Applying this treaty provision, the

---

[1] Article III of the Treaty provides in relevant part:

> *And provided*, That, if necessary for the public convenience, roads may be run through the said reservation; and on the other hand, the right of way, with free access from the same to the nearest public highway, is secured to them; as also *the right, in common with citizens of the United States, to travel upon all public highways*.

Treaty with the Yakamas, Art. III, 12 Stat. 951, 952-53 (1855) (second emphasis added).

district court dismissed the Government's indictment charging tribal members Kato and Harry Smiskin ("Smiskins") with violations of the federal Contraband Cigarette Trafficking Act ("CCTA"). At issue in this appeal is whether the Government's basis for maintaining a CCTA prosecution against the Smiskins — their alleged failure to comply with the State of Washington's requirement that individuals give notice to state officials prior to transporting unstamped cigarettes within the State — violated the Right to Travel provision of the Yakama Treaty. The district court determined that the State's pre-notification requirement, as applied to Yakama tribal members, did indeed violate the Treaty, and, therefore, that the unstamped cigarettes that the Smiskins allegedly transported could not be considered contraband within the meaning of the CCTA. Finding no legal basis for the Government's prosecution of the Smiskins under the CCTA, the court dismissed the indictment. The Government timely appeals.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo legal determinations and applications of law to fact, including the interpretation and application of treaty language. *See Cree v. Flores*, 157 F.3d 762, 768 (9th Cir. 1998) ("*Cree II*"); *United States v. Washington*, 969 F.2d 752, 754 (9th Cir. 1992). We hold that the district court did not err in interpreting and applying the Yakama Treaty to dismiss the indictment against the Smiskins. We affirm.[2]

## I.　Background

Defendants Kato and Harry Smiskin are members of the Confederated Tribes and Bands of the Yakama Nation ("Yakama Nation"). In June 2004, Agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") seized 4,205 cartons of unstamped cigarettes from Harry Smiskin's

---

[2]Because we affirm the district court's order granting the Smiskins' motion to dismiss, we do not address their alternative argument invoking the rule of lenity.

residence, located on the Yakama Indian Reservation.[3] Based on previous investigation and surveillance, ATF Agents suspected the Smiskins of transporting unstamped cigarettes from smoke shops on an Idaho Indian reservation to smoke shops on various Indian reservations in Washington.

The Smiskins were indicted on charges of violating the federal Contraband Cigarette Trafficking Act, 18 U.S.C. § 2342(a). Under the CCTA, it is "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." *Id.* The CCTA incorporates state law to define "contraband cigarettes:" " 'Contraband cigarettes' means a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found," and which are in the possession of a person not otherwise authorized by the State to possess such cigarettes. *Id.* § 2341(2).

Thus, whether the Smiskins transported contraband cigarettes under the CCTA turns on Washington State law. The State generally requires wholesalers to affix either a "tax paid" or "tax exempt" stamp to cigarette packaging prior to sale. *See* Rev. Code Wash. § 82.24.030. Individuals other than licensed wholesalers may only transport unstamped cigarettes if they have "given notice to the [Liquor Control Board] in advance of the commencement of transportation." *Id.* § 82.24.250(1). State law does not exempt Yakama tribal members from this pre-notification requirement.[4]

---

[3]These facts were presented in exhibits that the parties submitted to the district court, and which the court considered in ruling on the Smiskins' motion to dismiss.

[4]Although states cannot tax cigarettes sold to tribal members on Indian reservations, they may tax on-reservation sales to non-Indians. *See Washington v. Confederated Tribes of the Colville Reservation*, 447 U.S. 134, 160-61 (1980) ("*Colville*"); *Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463, 480-81 (1976). By requiring notice from tribal members before they transport unstamped cigarettes within the State, Washington is able to track cigarette imports for the purpose of enforcing the lawful tax on sales to non-Indians.

Because the Smiskins did not provide notice to the State prior to transporting unstamped cigarettes,[5] the cigarettes were unauthorized under State law and contraband under the CCTA. As a result, the Smiskins' possession and transportation of the contraband cigarettes violated the terms of the CCTA. The question that remains is whether a violation of the State's pre-notification requirement can provide a valid basis for a CCTA prosecution of Yakama tribal members.

## II.   Discussion

### A.   Applicability of the CCTA

**[1]** Federal laws of general applicability are presumed to apply with equal force to Indian tribes. *See United States v. Baker*, 63 F.3d 1478, 1484 (9th Cir. 1995); *United States v. Farris*, 624 F.2d 890, 893 (9th Cir. 1980). We held in *Baker* that the CCTA is a law of general applicability. *See* 63 F.3d at 1484. There are three established exceptions, however, that preclude the application of an otherwise generally applicable federal law to Indian tribes. *See id.* at 1485; *Farris*, 624 F.2d at 893-94. The Smiskins argue that this case falls within the Indian treaty exception. As we explained in *Baker*, a "federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if . . . the application of the law to the tribe would abrogate rights guaranteed by Indian treaties."[6] 63 F.3d at 1485 (internal quotation marks omitted). Congress must therefore expressly apply a statute to Indians in order to abrogate their treaty rights. *See*

---

[5]We presume the allegations of an indictment to be true for purposes of reviewing a district court's ruling on a motion to dismiss. *See United States v. Blinder*, 10 F.3d 1468, 1471 (9th Cir. 1993).

[6]The other two exceptions, which do not apply here, arise if the statute is silent regarding applicability to Indian tribes and either: (1) the law touches "exclusive rights of self-governance in purely intramural matters" or (2) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians." *Baker*, 63 F.3d at 1485 (alteration in original).

*Farris*, 624 F.2d at 893 ("[I]t is presumed that Congress does not intend to abrogate rights guaranteed by Indian treaties when it passes general laws, unless it makes specific reference to Indians.").

**[2]** There is no evidence that Congress intended to abrogate Indian treaty rights through adoption of the CCTA. Congress did not expressly make the CCTA applicable to Indian tribes, *see Baker*, 63 F.3d at 1485-86, and, if anything, the relevant legislative history suggests the opposite. *See* H.R. Conf. Rep. No. 1778, 95th Cong., 2d Sess. 1, 9 n.1, *reprinted in* 1978 U.S. Code & Cong. Admin. News 5535, 5538 ("[The CCTA is] not intended to affect transportation or sale by Indians or Indian tribes acting in accordance with legally established rights."). *But see Baker*, 63 F.3d at 1486 (interpreting this language as referring only to rights granted to Indian tribes by the states).

**[3]** The critical question, then, is whether applying the State of Washington's pre-notification requirement to Yakama tribal members who possess and transport unstamped cigarettes violates the Yakama Treaty of 1855. If it does, the Smiskins cannot be prosecuted under the CCTA on the basis of this state requirement. In light of our interpretation of the Right to Travel provision of the Yakama Treaty in *Cree II*, as well as the canons of construction for interpreting Indian treaties, we conclude that applying the State's pre-notification requirement to the Smiskins violates the right to travel guaranteed in Article III of the Treaty.

## B. The Yakama Treaty of 1855

The text of a treaty must be construed as the Indians would naturally have understood it at the time of the treaty, with doubtful or ambiguous expressions resolved in the Indians' favor. *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196, 200 (1999) ("*Mille Lacs Band*"); *see also Tulee v. Washington*, 315 U.S. 681, 684-85 (1942) ("It

is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council and in a spirit which generously recognizes the full obligation of this nation to protect [tribal] interests . . . ."). The Supreme Court has repeatedly applied this rule of treaty construction in construing Article III of the Yakama Treaty. *See Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676 (1979) ("This rule, in fact, has thrice been explicitly relied on by the Court in broadly interpreting these very treaties in the Indians' favor."). We have also applied this rule of construction in interpreting the Yakama Treaty, and the Right to Travel provision in particular. *See Cree II*, 157 F.3d at 769.

**[4]** As the starting point in its analysis, the district court thus properly turned to *Cree II*, where we addressed at length the Right to Travel provision of the Yakama Treaty.[7] In *Cree II*, the State of Washington had issued citations to truck drivers for logging companies owned by Yakama tribal members, because the companies had not paid the license and permit fees that the State imposed on trucks used to transport lumber to sale. *See id.* at 765. We held that applying the fees to the tribal members violated the Yakama Treaty's Right to Travel provision because the provision guarantees them the "right to transport goods to market over public highways without payment of fees for that use." *Id.* at 769.

The Government suggests that we limit *Cree II* to its holding that the Yakamas' right to travel precludes the State of Washington from imposing *fees* that impinge on this right. Because the state pre-notification requirement at issue here does not impose any fee, the Government argues that *Cree II*

---

[7]In *Cree II*, we affirmed the district court's judgment in *Yakama Indian Nation v. Flores*, 955 F. Supp. 1229 (E.D. Wash. 1997), following our remand in *Cree v. Waterbury*, 78 F.3d 1400 (9th Cir. 1996) ("*Cree I*").

does not apply and that the requirement does not violate the Yakama Treaty. We decline to draw such a distinction.

In *Cree II*, we expressly relied on the extensive factual findings made by the district court in that case — the *Yakama Indian Nation* district court. As we noted:

> The district court eloquently set forth its findings that travel was of great importance to the Yakamas, that they enjoyed free access to travel routes for trade and other purposes at Treaty time, and that they understood the Treaty to grant them valuable rights that would permit them to continue in their ways. We agree with the district court that, in light of those and its other findings, the Treaty clause must be interpreted to guarantee the Yakamas the right to transport goods to market over public highways without payment of fees for that use.

*Id.* at 769. Indeed, the *Yakama Indian Nation* district court conducted a "careful inquiry into the intentions of the parties" at the time of the Treaty, and considered extensive testimony from three experts and hundreds of exhibits. *See id.* at 774.

Further, in light of the detailed factual findings in *Yakama Indian Nation*, we have little difficulty in concluding that the Yakamas' treaty right extends to the case at hand. In *Yakama Indian Nation*, the district court determined that the Yakama Treaty, and the Right to Travel provision in particular, were of tremendous importance to the Yakama Nation when the Treaty was signed. *See* 955 F. Supp. at 1238. At that time, the Yakamas exercised free and open access to transport goods as a central part of a trading network running from the Western Coastal tribes to the Eastern Plains tribes. *See id.* Agents for the United States thus repeatedly emphasized in negotiations that tribal members would retain the "same liberties . . . to go on the roads to market." *Id.* at 1244, 1247. Indeed, although the United States "negotiated with the Northwest tribes many

treaties containing parallel provisions," a "public highways clause" promising a right to travel is found in only one other treaty. *Cree II*, 157 F.3d at 772.

**[5]** The United States also promised the Yakamas that they could rely on "all [the Treaty's] provisions being carried out strictly," *id.* at 767, and the Yakamas forever ceded about 10 million acres, or 90 percent of their land, in exchange for these rights. *See Yakama Indian Nation*, 955 F. Supp. at 1248, 1254; *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251, 256 (1992). The Yakama Nation thus understandably assigned a special significance to each part of the Treaty at the time of signing and continues to view the Treaty as a sacred document today. *See Yakama Indian Nation*, 955 F. Supp. at 1262.

**[6]** Based on these findings, the *Yakama Indian Nation* district court concluded that the Yakamas understood the Treaty at the time of signing to "unambiguously reserve[ ] to [them] the right to travel the public highways *without restriction* for purposes of hauling goods to market." *Id.* at 1248 (emphasis added). The court further determined that "both parties to the treaty expressly intended that the Yakamas would retain their right to travel outside reservation boundaries, *with no conditions attached*." *Id.* at 1251 (emphasis added). Finally, it found that "the Treaty was clearly intended to reserve the Yakamas' right to travel on the public highways to engage in *future* trading endeavors." *Id.* at 1253 (emphasis in original).

**[7]** In light of these findings, which we did not disturb in *Cree II*, the district court in the instant case properly concluded that the pre-notification requirement is a "restriction" and "condition" on the right to travel that violates the Yakama Treaty. Tribal members were not required to notify anyone prior to transporting goods to market at the time of the treaty,[8]

---

[8]As the Yakama Nation argues in its Amicus Brief, the Government "may not wishfully insist that the Yakamas should have understood in 1855 that federal agents would arrest and imprison tribal members who travel with untaxed tobacco without first notifying the territorial government."

and the Treaty guaranteed to them the same rights today. We agree with the district court that there is no basis in either the language of the Treaty or our cases interpreting it for distinguishing restrictions that impose a fee from those, as here, that impose some other requirement. Applying either type of requirement to the Yakamas imposes a condition on travel that violates their treaty right to transport goods to market without restriction.[9] Thus, just as the State cannot issue citations to tribal members for not paying fees before they bring lumber to market, the federal government cannot impose criminal sanctions on tribal members for not providing notice to the State before transporting tobacco for sale or trade.

Similarly, we refuse to draw what would amount to an arbitrary line between travel and trade in this context, holding, as the Government suggests, that the Yakama Treaty does not protect the "commerce" at issue in the Smiskins' case. We have already established that the Right to Travel provision "guarantee[s] the Yakamas the right to transport goods to *market*" for "*trade* and other purposes." *Cree II*, 157 F.3d at 769 (emphases added). Thus, whether the goods at issue are timber or tobacco products,[10] the right to travel overlaps with the right to trade under the Yakama Treaty such that excluding commercial exchanges from its purview would effectively abrogate our decision in *Cree II* and render the Right to Travel provision truly impotent. *See Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S. 392, 397 (1968) ("To construe the treaty as giving the Indians no rights but such as they would have without the treaty would be an impotent outcome

---

[9]Indeed, were we to agree with the Government, Yakama tribal members who transport cigarettes without providing notice to the State would face felony charges under the CCTA and up to five years in prison and $250,000 in fines. *See* 18 U.S.C. §§ 2344(a), 3571(3). As a practical matter, we fail to see how this criminal penalty would impede less on the Yakamas' right to travel than the minimal fines at issue in *Cree II*.

[10]As the Yakama Nation notes in its Amicus Brief, eyewitness accounts confirm that tobacco had been a significant medium of trade for the Yakamas for over fifty years when the Treaty was signed in 1855.

to negotiations and a convention which seemed to promise more, and give the word of the Nation for more." (citations omitted) (internal quotation marks omitted)).

Neither do we find our decision in *Baker* determinative. In *Baker*, we held that the CCTA validly applied to members of the Puyallup Indian Tribe notwithstanding a "right to trade" allegedly promised the Tribe in the Medicine Creek Treaty. *See* 63 F.3d at 1485. Similar to the present case, the Puyallup tribal members had trafficked in unstamped cigarettes without obtaining prior approval from the State of Washington, in violation of Washington Administrative Code section 458-20-192. The cigarettes were therefore unauthorized under state law and contraband under the CCTA.

The Supreme Court's jurisprudence makes clear, however, that we must interpret a treaty right in light of the particular tribe's understanding of that right at the time the treaty was made,[11] and *Baker* addressed a different tribe, a different treaty, and a different right. Indeed, the relevant portion of the Medicine Creek Treaty involved in *Baker* did not expressly grant any right to the Puyallup Tribe, providing only that, "[t]he said tribes and bands finally agree not to trade at Vancouver's Island, or elsewhere out of the dominions of the United States." *Id.* Thus, the defendant tribal members could only argue that, by including such a restriction, the Treaty intended no other restrictions on Indian trade. *See id.* This ambiguous treaty language stands in stark contrast to the text of the Yakama Treaty, which expressly grants the "right to travel . . . upon all public highways," and our interpretation of the Treaty in *Cree II*.[12] Further, although we held in *Baker*

---

[11]*See, e.g.*, *Mille Lacs Band*, 526 U.S. at 201-02 (noting that similar language in two treaties may have different meanings because the Court examines "the historical record and . . . the context of the treaty negotiations to discern what the parties intended by their choice of words"); *Fishing Vessel*, 443 U.S. at 675 ("Accordingly, it is the intention of the parties . . . that must control any attempt to interpret the treaties.").

[12]For similar reasons, our decision in *Farris* is inapposite. There, we concluded that another provision of the Medicine Creek Treaty, promising

that the CCTA did not violate the Medicine Creek Treaty even "assuming the defendants are correct about the expectations of the signers," we addressed only the "trading right" allegedly guaranteed by the Medicine Creek Treaty, not the very different "right to travel" promised by the Yakama Treaty. *See* 63 F.3d at 1485.

Additionally, in *Baker*, we did not find the characteristics of the state requirement then at issue relevant to our holding. Instead, we simply held that the "CCTA is not an impermissible restriction on a trading right guaranteed by the [Medicine Creek] Treaty." *Id.* This broad holding cannot apply with similar force to the Yakama Treaty. In light of *Cree II*, the CCTA would certainly be an impermissible restriction on the Yakamas' right to travel if the Government could rely on it to enforce against tribal members a state *fee* on the transport of unstamped cigarettes. Consequently, because *Baker* did not draw a distinction between such a fee based requirement and other types of requirements, it sheds no light on the critical question we resolve here: whether the State of Washington's pre-notification requirement is distinguishable from the fee based requirements at issue in *Cree II*, such that applying it to Yakama tribal members would not violate their treaty right to travel.

[8] Finally, the Government argues that the Yakamas' right to travel applies only to "tribal goods," which it defines as goods that are either collectively owned or produced on the reservation by the Tribe. Hence, the Treaty would apply to the reservation produced timber at issue in *Cree II*, but not to the cigarettes at issue here, which the Government alleges are not

---

"exclusive use" of reservation land, was not specific enough to preempt a federal gambling statute. *See* 624 F.2d at 893. The Yakama Treaty's more detailed public highways clause, which sets forth a specific right to travel and has been the subject of extensive judicial interpretation, is sufficiently specific to preclude application of Washington's pre-notification requirement through the CCTA.

tribally owned or produced. The Government makes two points in support of its position. First, it calls our attention to the occasional references to "tribal goods" in *Yakama Indian Nation* and *Cree II*. *See Yakama Indian*, 995 F. Supp. at 1249; *Cree II*, 157 F.3d at 768. However, we referred simply to "goods," not "tribal goods," in ultimately defining the Yakamas' right to travel in *Cree II*. *See* 157 F.3d at 769; *see also Yakama Indian Nation*, 995 F. Supp. at 1248 (defining the Treaty right as protecting "goods"). Further, we held that the Yakama Treaty precluded the State from issuing citations to the plaintiff logging companies, which were privately owned by *individual* tribal members. *See Cree II*, 157 F.3d at 765. We also cited with approval *Yakama Indian Nation*'s ruling that the Treaty right to travel "can be exercised by its *individual* members," *id.* at 774 (quoting *Yakama Indian Nation,* 955 F. Supp. at 1260) (emphasis added), which is in accord with the Supreme Court's jurisprudence. *See Puyallup Tribe, Inc. v. Dep't of Game of Wash.*, 433 U.S. 165, 171 (1977) (stating that "individual defendants were members of the Tribe and therefore entitled to the benefits of the Treaty"). Thus, we conclude that the use of the term "tribal goods" in *Yakama Indian Nation* and *Cree II* meant only that the "goods" must be transported by "tribal" members.

**[9]** Also in support of its position, the Government directs us to the district court's finding in *Yakama Indian Nation* that "[t]rucks owned by *individual* Indians have never been exempt from [vehicle] license fees." 955 F. Supp. at 1232-33 (emphasis added); *see also Cree II*, 157 F.3d at 765 (noting this finding). Although the court did not explain the relevance of this fact, the Government suggests that the State's imposition of such fees on the property of individual Indians shows that the parties did not understand the Treaty to protect non-tribal goods. However, it is well established that parties' post-treaty actions are relevant only insofar as they reflect on the determinative issue, the parties' intent *at the time the treaty was signed. See Cree I*, 78 F.3d at 1403; *see also Yakama Indian Nation*, 955 F. Supp. at 1254 (discussing Supreme

Court cases that "clearly hold that subsequent actions cannot rewrite or expand a treaty beyond its clear terms"). Here, there is evidence from the time of treaty suggesting that the Yakamas then understood the right to travel to extend beyond tribal goods. Specifically, given the Tribe's centrally located position as part of an inter-tribal trading network, it is likely that the Yakamas transported not only their own goods but also goods produced by other tribes in the network.[13] *See Yakama Indian Nation*, 955 F. Supp. at 1238. In sum, we disagree with the Government's argument that the Yakamas' treaty right to travel protects only collectively owned or reservation derived goods.

## C. The "Regulatory" Exception

**[10]** In resolving conflicts between state laws and Indian treaties, the Supreme Court has provided a narrow exception to the inviolability of treaty rights, holding that "pure regulations" — restrictions imposed for a public purpose unrelated to revenue generation — may be validly applied to tribal members, treaty rights notwithstanding. For instance, in addressing the State of Washington's fishing license fees and the "right to fish" provided by the Yakama Treaty, the Court held that the State retained the "power to impose on Indians equally with others such restrictions of a *purely regulatory* nature . . . as are necessary for the conservation of fish." *Tulee*, 315 U.S. at 684 (emphasis added); *see also Puyallup Tribe*, 391 U.S. at 401 n.14 ("As to a 'regulation' concerning the time and manner of fishing outside the reservation (as opposed to a 'tax'), we said that the power of the State was to be measured by whether it was 'necessary for the conserva-

---

[13]Also, it is not clear that post-treaty conduct points in the direction that the Government suggests. *See Yakama Indian Nation*, 955 F. Supp. at 1245 (noting that most individual Indian vehicle owners did not in fact license their vehicles despite the State's requirement); *see also Cree II*, 157 F.3d at 773 ("While examining the parties' actions may be helpful in construing a treaty, in this case, post-Treaty activity is inconclusive." (citation omitted)).

tion of fish.' " (quoting *Tulee*, 315 U.S. at 684)). The Court concluded, however, that the State's fishing license fees did not fall within this exception, and thus could not be imposed on tribal members, because they were "regulatory as well as revenue producing" and were not indispensable to the regulatory purpose of fish conservation. *Tulee*, 315 U.S. at 685. As the Court noted, the stated purpose of the licensing act was to generate revenue for "the support of the state government and its existing public institutions." *Id.*

[11] Similarly here, Washington's stated purpose for requiring cigarette stamps, and hence for requiring notice before unstamped cigarettes are transported within the State, is to "enforce collection of the tax hereby levied." Rev. Code Wash. § 82.24.030; *see also Baker*, 63 F.3d at 1486-87 (discussing in detail the State's scheme for enforcing cigarette taxes through these requirements). Because the primary purpose of tax collection is to generate state revenue, the district court in the instant case correctly determined that the State's notice requirement does not fall within the Court's "purely regulatory" exception, and that its application to Yakama tribal members is precluded by the Yakama Treaty.[14]

[12] The Government's suggestion that the State's tax collection efforts have a purpose beyond revenue generation does not change our analysis. Arguably, the State seeks to enforce

---

[14]Although we did not expressly address the regulatory exception in *Cree II*, the district court's analysis in *Yakama Indian Nation* is instructive. *Yakama Indian Nation* held that the State license and permit fees could not supersede the Yakamas' treaty right because the fees were "predominantly revenue-raising rather than regulatory" and not "indispensable" to any regulatory purpose. 955 F. Supp. at 1256. The court properly recognized, however, that tribal members must still comply with State "regulations designed to preserve and maintain the condition of roads" and "registration requirements solely for identification purposes," insofar as the regulations do not impose any fees (presumably, the imposition of fees would be compelling evidence of an impermissible revenue generating purpose on top of the regulatory purpose). *Id.* at 1260; *see also id.* at 1257.

taxes on cigarette sales from Indians to non-Indians in part to ensure a "fair playing field" for Indian and non-Indian cigarette retailers. However, even assuming that the State has such a purpose, a restriction must be *purely* regulatory to supersede an Indian treaty right. Because revenue generation is at least a significant purpose of the State's cigarette tax scheme, as the Government concedes, the scheme is not purely regulatory. Additionally, a state regulation must be "necessary" to its regulatory purpose to supersede a treaty right. The pre-notification requirement is not necessary to the State's alleged purpose of leveling the playing field because there are other ways it could enforce the tax on cigarette sales by Indian tribes to non-Indians.[15] *See infra* Part II. E.

## D.   The Minimal Burden Test

**[13]** The district court also properly held that the minimal burden test, which the Supreme Court has used in balancing state laws against inherent tribal sovereignty rights,[16] is not applicable here. Neither the Supreme Court nor this Circuit have applied such a balancing test in the context of treaty rights. The Supreme Court decisions cited by the Government only briefly mention Indian treaties, if at all, and apply the minimal burden test solely in relation to tribal sovereignty rights. *See Colville*, 447 U.S. 134; *Moe*, 425 U.S. 463. Similarly, in our decisions discussing both treaty rights and the minimal burden test, we conduct two separate analyses: first,

---

[15]Additionally, if this alleged purpose — leveling the playing field — were sufficient to meet the regulatory exception, it would call our holding in *Cree II* into question. The "fair playing field" argument applies with equal force to the State's efforts to collect truck license and permit fees from Indian-owned timber companies.

[16]Indian tribes retain "inherent sovereign powers" that they "enjoy[ ] apart from express provision by treaty or statute." *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997); *see also Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137-41 (1982) (discussing tribal sovereignty). However, state laws that impose only minimal burdens on these rights may be permissible. *See Colville*, 447 U.S. at 151; *Moe*, 425 U.S. at 483.

we determine whether the state law violates a specific treaty right; then, only if no treaty right is violated, we ask whether the state law nonetheless imposes more than a minimal burden on tribal sovereignty rights. *See, e.g.*, *Baker*, 63 F.3d 1478. Because the Yakamas' treaty right to travel is violated here, we do not reach the second step. The district court's decision is further supported by the Court's analysis in *Tulee*, which did not apply a minimal burden test despite describing the state law as not particularly intrusive.[17] *See* 315 U.S. at 864-65 ("Even though this method may be both convenient and, in its general impact fair, it acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve.").

## E.   Additional Concerns

**[14]** Finally, we agree with the district court that its decision does not pose the dangers suggested by the Government. First, the Government contends that the court's ruling, if affirmed, would preclude the State of Washington and the federal government from regulating tribal transportation of other "restricted goods," such as illegal narcotics and "forbidden fruits [and] vegetables." This concern is unfounded, if not disingenuous. As the Government argued extensively in its brief to this court, and as we discussed above, regulations with a purely regulatory purpose can be applied to Indians, treaty rights notwithstanding. The restricted goods to which the Government refers are regulated for the public safety, not for a revenue generating purpose. Drug laws, for instance, have the stated purpose of protecting the public from the dangers of drug use and the drug trade, and are not intended to

---

[17]Also, the Government misconstrues statements by the Court that tribal sovereignty provides a "backdrop" to understanding Indian treaties. *See, e.g.*, *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 172-73 (1973). The Court made these statements in explaining that tribal sovereignty rights are the basis for construing Indian treaties in favor of the tribes, not to suggest that treaty rights are subject to the same minimal burden test as tribal sovereignty rights.

generate revenue for the government. To the contrary, cigarettes are generally legal, and unstamped cigarettes are deemed contraband when individuals transport them without providing notice to the State only for the sake of improving the collection of cigarette taxes and increasing State revenues ("fair playing field" arguments aside).

Further, we note the more practical response to such concerns, which the Yakama Nation presented in its Amicus Brief:

> The Yakama Nation is a sovereign nation, with its own government, laws and courts, not a rogue organization or menace to civil order. The Yakama Nation does not and never has asserted that its members have a right under its treaty to traffic in narcotics. For the government of the United States to be suggesting otherwise is irresponsible.

> The Yakama Nation must and will intercede as litigant or *amicus* to protect its members' treaty right to travel when the federal government overreaches, as it has here. But the Nation has no interest in promoting, condoning, or protecting activities by its members that pose real dangers to public health, public safety, natural resources, or public infrastructure. The Nation has no such interest not only because irresponsible overreaching on its part would likely prompt Congress to exercise its constitutional/political power to abrogate or limit the treaty right to travel, but also because the Yakama Nation and its members share the interest all citizens have in public health, public safety, conservation and equitable exploitation of natural resources, and adequate public infrastructure.

[15] The Government also expresses concern that the State will suffer large revenue losses if we affirm the district court's

decision, arguing that the State will be unable to enforce its cigarette taxes against the Yakama Nation if it cannot require notice from tribal members before they transport unstamped cigarettes within the State. The Supreme Court has held, however, that tribal rights may preclude a state "from pursuing the most efficient remedy" to enforce a valid cigarette tax on Indians.[18] *See Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 514 (1991). As the Court noted, states have a number of "adequate alternatives" available to enforce taxes on cigarettes sales to non-Indians by tribal members.[19] *See id.*

## III.   Conclusion

In sum, we affirm the district court's orders denying reconsideration and dismissing the charges against the Smiskins. The Government cannot rely on the State of Washington's pre-notification requirement as the basis for pursuing a CCTA prosecution against tribal members of the Yakama Nation. The State's requirement is not purely regulatory in nature and applying it to tribal members would restrict a uniquely important right to travel that the Yakama nation understood both at the time of the treaty and now as critical to the preservation of their culture, economy, and way of life. Therefore, the Smiskins' alleged transportation and possession of unstamped cigarettes without providing notice to the State cannot be the

---

[18]Notably, the Government has not alleged that the Smiskins, whom it believes to be delivering cigarettes from one tribe to another, have sold any unstamped cigarettes to *non*-Indians.

[19]For instance, as has been successful in similar situations, the State could attempt to reach a mutually satisfactory agreement with the Yakama Nation regarding the enforcement of cigarette taxes. Indeed, the State's Department of Revenue has an official policy of working with tribes "on a government-to-government basis to discuss and resolve areas of mutual concern." Wash. Admin. Code § 458-20-192(1).

basis for prosecution under the CCTA.

**AFFIRMED.**